### THE ASHBOURNE.

(District Court, S. D. New York. · December 27, 1901.)

TUG AND TOW—LOSS OF TOW—NEGLIGENT NAVIGATION BY TUG.

 A tug undertook to tow two barges laden with coal across New York Bay from a safe anchorage at Constable Hook at a time when the wind was blowing at a rate between 50 and 60 miles an hour and had been increasing for several hours, and one of the barges swamped and was lost, with her cargo. *Held*, that the tug was in fault for negligently attempting to cross under such circumstances, and liable for the loss, and that, the movement being controlled by the master of the tug, the barge was not guilty of contributory fault because her master failed to object to the attempted passage.

In Admiralty. Action against tug for loss of tow.

James J. Macklin, for libelant.
James Armstrong, for claimant.

ADAMS, District Judge. Early in the morning of the 9th day of November, 1900, the tugs Transit and Ashbourne, owned by the Philadelphia & Reading Railway Company, took a flotilla of boats in tow at Port Reading, bound through Staten Island sound and Kill Von Kull for New York, or its vicinity. Among the boats were two barges, numbers 53 and 73, belonging to the libelant, laden with coal, and bound east through the East river. The tow arrived at Constable Hook at about 10:30 o'clock a. m., and tied up, but the Ashbourne took the two barges mentioned out of the flotilla and proceeded to tow them across New York Bay, for delivery at Gowannus Bay, the usual place where the barges of the libelant company, bound east, were delivered. During the attempted voyage across New York Bay, the barge No. 73 was sunk by being swamped in tempestuous weather, and the libelant now seeks to recover the loss, upon the allegation that the Ashbourne was in fault for negli-

gently attempting to cross New York Bay under the circumstances. The claimant contends that the weather was not such in leaving the sheltered place at Constable Hook, or before entering the bay, as to make it negligent for the Ashbourne to proceed, and that the trouble arose through the breakage of an old and insufficient line, which belonged to one of the libelant's barges, and fastened No. 73 to 53, the latter being the leading boat, which caused No. 73 to swing broadside to the sea, and was the proximate cause of the accident. There is the usual conflict of testimony on the matters in issue, but the determination of the case is relieved of any great difficulty by the condition of the weather, as shown by the records of the United States weather bureau in New York. It appears that at 2 o'clock in the morning of the day in question the velocity of the wind was 9 miles an hour; from 3 o'clock to 4 o'clock, 16 miles, from 5 o'clock to 6 o'clock, 29 miles; from 6 o'clock to 7 o'clock, 31 miles; from 7 o'clock to 8 o'clock, 33 miles; from 8 o'clock to 9 o'clock, 43 miles; from 9 o'clock to 10 o'clock, 52 miles; from 10 o'clock to 11 o'clock, 54 miles; from 11 o'clock to 12 o'clock, 59 miles; from 12 o'clock to 1 o'clock, 60 miles. The wind during the time was from west to northwest. The records further show that the severest blow of the season visited the city on that day; that the barometer, which had been falling on the previous day, continued to fall on the 9th until 8 o'clock a. m.; that the wind commenced to freshen at 3 o'clock a. m. on the 9th, and by 5 o'clock a. m. was blowing briskly from the west, and by 8 o'clock a. m. was blowing at the rate of 35 miles an hour; that the increase was very marked after 5 o'clock a. m., and was at the force of a gale between 8:10 o'clock a. m. and 9:15 o'clock a. m. After 9:10 o'clock a. m. it was of hurricane force. Northwest storm warning signals were displayed on the roof of the American Surety Building, 314 feet above sea level, from 2:55 o'clock p. m. of the 8th, and continued beyond the time of this accident. This evidence leaves no room for doubt that the Ashbourne was in fault, and the manifestly untruthful testimony on her part resolves the disputed questions of fact in favor of the libelant, including that concerning the sufficiency of the towing line. I am satisfied that the line was adequate for all ordinary towing purposes. The fact that it broke under the stress to which it was subjected does not tend to show want of capacity to resist such strains as it should properly have been exposed to. It is also contended by the claimant that the master of the boat assented to being taken across the bay, and, if the tug was in fault, the boat was also in fault. It appears, however, that the master of No. 53 protested against being taken from Constable Hook, and it may properly be assumed that any nonassent on the part of the master of No. 73 would have been equally futile. It was not a case of a master of a boat about to be towed voluntarily exposing his boat to danger; but one where the mind of the master of the tug governed the adventure, with a corresponding liability on the part of the tug for the disastrous results. The Nannie Lamberton (D. C.) 79 Fed. 121; Id., 29 C. C. A. 519, 85 Fed. 983.

Decree for the libelant.